UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LARRY A. THORINGTON,

    Plaintiff,                                   Case No. 18-10762
                                                 Honorable Thomas L. Ludington

vs.

STEVE TOWNSEND and MICHAEL
SHEA,

    Defendants.
_____/

**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DISMISSING DEFENDANT MICHAEL SHEA**

On March 7, 2018, Plaintiff Larry A. Thorington filed a complaint against Sergeant Steve Townsend and Sheriff Michael Shea of the Gladwin County Sheriff's Department. ECF No. 1. Count I alleges that Townsend violated the Fourth Amendment by using excessive force when effectuating the arrest of Plaintiff, leading to injuries to Plaintiff's left arm. Count II alleges that Shea violated the Fourteenth Amendment because he was deliberately indifferent to Plaintiff's medical needs while Plaintiff was held at the Gladwin County Jail. After six months of discovery, Defendants moved for summary judgment. ECF No. 17. Plaintiff responded and Defendant replied. ECF Nos. 23, 27.

**I.**

Plaintiff has had an ongoing property line dispute with a restaurant located next to his property, the River House Bar and Grill. On March 16, 2017, at around 4:30pm, Plaintiff visited the property next to the River House to see if the septic fields were leaking onto his boat ramp. Thorington Dep. at 75-77, ECF No. 17-2. Plaintiff testified that he had a couple shots of whiskey

from a half-pint bottle. *Id.* at 80. Plaintiff testified that when he got out of his truck to check the septic fields, River House's manager Kathryn Wong came running out screaming at him "get off my property." *Id.* at 78, 80. He responded "I'm not on your property."[1] *Id.* Ms. Wong testified that Plaintiff told her to "watch [her] stupid cunt self" and that he knows where she lives, which she interpreted as a threat. *Id.* at 39. Plaintiff denies calling her names or saying he knows where she lives, but admits to cursing and saying "fuck you." *Id.* at 86.

Ms. Wong said she was calling the police, to which Plaintiff replied "go right ahead" and then sat in his truck waiting for them to arrive. *Id.* at 84-85. Plaintiff heard Ms. Wong call the police on her cell phone and tell them that he was trespassing. *Id.* at 89. He finished the half-pint bottle "so that if the cops showed up, they'd think I was drunk," and so that the bottle wouldn't be in his truck when the police arrived. *Id.* at 81, 84. When the police pulled up, Plaintiff got out of his truck and told the police not to come onto his property without a warrant. *Id.* at 90. The first officer he encountered was Eaton, who told Plaintiff "I can go anyplace I want to." *Id.* at 93. Deputy Eaton screamed at Plaintiff and Plaintiff screamed back, cursing at Deputy Eaton. *Id.* at 94. Deputy Eaton asked for Plaintiff's ID, which Plaintiff refused to give him because Plaintiff believed that Deputy Eaton was trespassing on his property. *Id.* Plaintiff told him something to the effect of "fuck you, go to talk to the Sheriff"[2] to which Eaton responded "I don't have to ask the Sheriff." *Id.* at 95.

The different witnesses offered various accounts of what happened next. According to

---

[1] The parties offered some discussion regarding this property line dispute and the history behind it. It is irrelevant for present purposes, however, whether Plaintiff was actually trespassing on Ms. Wong's property, whether he was on his own property, or whether he was on a public right of way. These questions theoretically have some relevance to the propriety of the arrest. However, Plaintiff does not challenge the legal basis for his arrest. Moreover, the property line question has no apparent relevance to the question of whether Sgt. Townsend used gratuitous force at the point of arrest.

[2] Plaintiff testified that, about 1-year earlier, he had given the Sheriff a survey of his land and told him to stay off of it. *Id.* at 95.

Plaintiff, Townsend asked Plaintiff to come over next to the patrol car, which he did. *Id.* at 99. Eaton told him he was under arrest. *Id.* Plaintiff put his hands behind his back as far as they would go. *Id.* He was told to put them further behind his back. *Id.* He said he could not. *Id.* Townsend was yelling at him "Get your arm over there . . . and he grabbed on and tried to jerk me arm over there and when it wouldn't go, he went wham, and snapped it." *Id.* at 104. Plaintiff couldn't say for sure if he saw Townsend jerk his arm because Townsend was behind him, but he believed it was Townsend because he heard Townsend's voice hollering at him. *Id.* at 105.

Plaintiff testified that he probably was yelling and cursing at the officers during this interaction, but that he did not resist. Thorington Dep. at 116-117. Ms. Wong testified that Plaintiff attacked Deputy Eaton. Wong Dep. at 12-14. ECF No. 17-1. Neither Sgt. Cuddy's nor Sgt. Townsend testified that Plaintiff attacked Deputy Eaton. Sgt. Cuddie's incident report states that Plaintiff was non-compliant with commands to put his hands behind his back and that he appeared "unable or unwilling to comply." ECF No. 17-6. The incident report does not mention that Plaintiff attacked Deputy Eaton. Sgt. Townsend testified that Plaintiff was argumentative, but that he did not witness Plaintiff resisting any of the officers, nor did Plaintiff resist Sgt. Townsend. *Id.* at 68-70. Sgt. Townsend testified, confusingly, that he did not use force but that a control hold was used which he considers a use of force. *Id.* at 58-60. Cuddie testified that Eaton put Plaintiff in a "partial control hold or had a ahold of his left arm." Cuddie Dep. at 18, ECF No. 17-7.

When Plaintiff arrived at the Gladwin County jail on the evening of March 16, he reported that he thought his arm was broken. Thorington Dep. at 125-126, 128, 130, 132. He was evaluated by the jail nurse that same evening. *Id.* at 133. The nurse's report indicates that there was no visible injury, no redness or swelling, and that he was "able to extend arm fully flex at his

elbow as well as rotate in and out fully" though he did complain of pain with movement. Nurse Fall notes, ECF No. 17-9. The following morning, Sheriff Shea entered Plaintiff's cell, and Plaintiff told him that the arresting officers broke his arm. Shea Dep. at 10-13, ECF No. 17-10. He examined Plaintiffs' arm and found no visible injury, redness, or discoloration. *Id.* at 15. Sheriff Shea spoke with Nurse Fall after meeting with Plaintiff, and Nurse Fall did not give him any indication that there was cause for immediate concern. *Id.* at 18. Nurse Fall testified that she could not recall whether she spoke with Sheriff Shea about Plaintiff. Fall Dep. at 16, ECF No. 23-10.

Plaintiff was released from Gladwin County Jail at 4:22pm. Shift Log, ECF No. 23-7. He reported to the Mid-Michigan Medical Center Emergency Department at 4:39pm. ER Records, ECF No. 17-11. The X-rays at the hospital were negative for a bone fracture. ECF No. 23-12. Plaintiff was diagnosed with a probable left upper extremity contusion and discharged. ECF No. 17-11. After a follow-up MRI five days later, Plaintiff was diagnosed with a "blowout" tear of the lateral ulnar collateral ligament as well as a deep partial tear at the origin of the common extensor tendon, and a large joint effusion and diffuse elbow subcutaneous soft tissue swelling edema. ECF No. 17-11 at 2.

Plaintiff was charged with misdemeanor disorderly person and trespassing. Thorington Dep. at 166. The trespassing charge was dismissed and Plaintiff pled guilty to a reduced charge of attempted disturbing the peace. *Id.* at 167.

## II.

### A.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). "The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**B.**

A plaintiff proceeding under § 1983 must establish at least a genuine issue of fact on the question of whether a person acting under color of state law deprived him of a right secured by the Constitution or by federal law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The plaintiff must also demonstrate that the defendants are not entitled to qualified immunity. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity turns on the question of whether a defendant's action violated clearly established law. *Id*. at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id*. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, (1999). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

**C.**

When an excessive force claim arises, as here, "in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the

Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment guarantees citizens the right to be free from "unreasonable" seizures, and thus the inquiry in excessive force cases under the Fourth Amendment turns on whether the seizure was reasonable. *Id.* at 394–96. In determining whether a seizure was reasonable, the court must carefully balance the individual's Fourth Amendment interests against the "countervailing governmental interests at stake." *Id.* at 396. Relevant factors include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Courts must look to the totality of the circumstances, but must view the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Importantly, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* In other words, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Rather, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. There is thus "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

**C**.

The Eighth Amendment protects prisoners from deliberate indifference to medical needs. Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 545 (1979). A constitutional claim for the deprivation of adequate medical care "has two components, one objective and one subjective." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), *cert. denied*, 537 U.S. 817 (2002)). The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Dominguez*, 555 F.3d at 550 (6th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

To establish a serious need for medical care, "*Farmer* requires only that 'the inmate show that he is incarcerated under conditions posing a substantial risk of serious harm[,]' so as to avoid 'the unnecessary and wanton infliction of pain.'" *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 896 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834). A serious medical need may be demonstrated by a physician's diagnosis mandating treatment or a condition that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. at 897 (citations omitted).

Establishing the subjective component requires plaintiff to "show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Dominguez*, 555 F.3d at 550 (quoting *Comstock*, 273 F.3d at 703). Deliberate indifference requires "more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703 (citations omitted). Courts evaluating such a claim "distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate

medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976)).

"Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments,' although 'it is possible for medical treatment to be 'so woefully inadequate as to amount to no treatment at all.'" *Id.* (citing *Westlake*, 537 F.2d at 860 n. 5). But "a desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Rhinehart v. Scutt*, 509 F. App'x 510, 513–14 (6th Cir. 2013)) (other citation omitted). *See also Alspaugh*, 643 F.3d at 169 (while "Alspaugh certainly would have desired more aggressive treatment, he was at no point denied treatment.").

### III.

### A.

Defendant's motion for summary judgment of the excessive force claim will be denied. The defense theory advanced in support of the motion for summary judgment conflicts with Townsend's testimony during his deposition. Defendant contends in the motion that Townsend's use of force was reasonable to overcome Plaintiff's resistance. However, Townsend testified that he did not use force and that Plaintiff did not resist:

> Q: Yes. Paragraph 22 says, "Mr. Thorington was fully compliant and submitted to the officer's authority and to the arrest." Is that a true statement?
>
> A: No.
>
> Q: And why is that not true? What about the statement is not true?
>
> A: He appeared argumentative with the two officers that were there.

Q: Other than being verbally argumentative, was Mr. Thorington fully compliant and submitted to the officers' authority and to the arrest?

A: No.

Q: And why – why do you say that?

A: Because a control hold was used to place his arms behind his back.

Q: But a control hold can be used when – even when some one is not being un-compliant, true?

A: A control – I'm sorry?

Q: A control hold doesn't require that someone be non-compliant to be used, does it?

A: No.

Q: I mean you can use a control hold when you're arresting someone who's completely complying with your instructions to offer their hands behind their back, right?

A: You can, yes.

Q: The next sentence reads, "At no time did he offer any resistance or refuse to comply with any instruction." Is that a true statement?

A: Let me – can I read it entirely, please?

Q: Sure.

A: I don't know.

Q: The next sentence says, "Mr. Thorington," – and by the way, you don't know because you don't know whether it's true or whether it's not true; is that correct?

A: Yes, that's correct. I heard Sgt. Cuddie telling him to relax, so I don't know if he was telling him to relax because he was noncompliant or if he was -- or if he was refusing to comply. I don't know.

Q: Based on your observations though, based on anything you yourself saw with your own eyes, you did not see him being un-complaint, did you?

A: I just – no. Sorry. I was going to tell you I just walked up with handcuffs.

Q: And based on your observations you personally did not see him offering any resistance; is that true?

> A: He did not resist me, no.
>
> Q: And you did not see him resisting anyone else; is that true?
>
> A: No. I'm sorry.
>
> Q: Let me ask –
>
> A: Yes. I did not see him resisting.
>
> Q: It's a true statement that you did not see him resisting; is that a true statement?
>
> A: Yes.
>
> Q: You didn't see him resisting you, you didn't see him resisting Sgt. Cuddie, and you didn't see him resisting Deputy Eaton, all of those are true statements?
>
> A: Yea, I was unclear whether he was resisting Sgt. Cuddie. That's – that's where I'm hesitating. I'm unsure if Cuddie was telling him, "Stop resisting, relax," and also controlling him with force, or if he was just holding on telling him, "Hey, just relax." I don't – I'm unclear on that situation. I don't know.
>
> Q: But based on what you yourself saw, forget about what Sgt. Cuddie may have been perceiving. I'm not asking you to get in his mind. I'm just trying to get into your best memory of what you observed at the time this is happening. As you sit here, your best memory, did you observe Mr. Thorington resisting anybody?
>
> A: No.

Townsend Dep. at 71.

In his motion for summary judgment, Defendant reasonably underscores the fact that Plaintiff appeared drunk, smelled of alcohol, was argumentative, combative, vulgar, rude, and urinated on himself. These facts are undisputed (though Plaintiff contends the cause of the urination was incontinence, not alcohol). Defendant also offers the testimony of Ms. Wong regarding Plaintiff's behavior prior to the arrest, which is also largely undisputed. And while that may be true, it is not relevant to the assessment of the interaction between Plaintiff and

Townsend at the point of arrest.³ Townsend also witnessed Plaintiff in a control hold with Sgt. Cuddie telling him to relax.

However, *at the point Townsend effectuated the arrest*, he testified that Plaintiff did not resist him nor did Townsend witness Plaintiff resist any of the officers. *Id.* Moreover, he testified that he did not use any force. *Id.* at 58-60. Thus, the argument advanced in support of the motion for summary judgment is inapposite. The qualified immunity defense is equally inapplicable. Townsend cannot simultaneously claim 1) that he used force that was objectively reasonable, and 2) that he did not use force. *Id.* at 58-60.

Defendant's reliance on *Marvin* is misplaced, as the suspect in *Marvin* was resisting arrest. *Marvin v. Taylor*, 509 F.3d 234, 248 (6th Cir. 2007). Defendant's attempt to a draw a distinction between active and passive resistance is also unpersuasive. Regardless of the resistance Plaintiff may have offered prior to Townsend's arrival at the scene, Townsend testified that he neither encountered nor witnessed any resistance. *Marvin* does not stand for the proposition that an officer is per se justified in using "the amount of force necessary to bring Plaintiff's arms closer together and complete the process" of handcuffing. Def. Mot. at 16.

Because it is undisputed that Plaintiff did not resist arrest, his disruptive behavior prior Townsend's intervention is irrelevant, and the only relevant issue is what occurred at the point Townsend effectuated the arrest. Here, there is a question of fact on this point. Plaintiff contends that someone jerked his arm behind his back, snapping his arm after Plaintiff stated he could not move his arm any further behind his back. Thorington Dep. at 104. Although he could not see Townsend (who was behind him), he believed Townsend was the person who jerked his arm

---

³ Defendant also offers Ms. Wong's and Mr. Searfoss's testimony that Plaintiff attacked Deputy Eaton. Again, this has no bearing on the objective facts as observed by *Townsend* at the point *Townswend* effectuated the arrest of Plaintiff. Moreover, this testimony is uncorroborated by any of the other evidence in this case. Thus, it is unclear why this testimony was presented at all.

because Townsend was hollering at him. Thorington Dep. at 104-105. Townsend denies jerking Plaintiff's arm, and offers a rather unintelligible story of what did occur, a story involving three officers affixing multiple sets of handcuffs to various points on Plaintiff's arm and/or affixing the different sets of handcuffs to each-other:

> Sgt. Townsend testified as follows:
>
> Q: You arrive on scene, Sgt. Cuddle and Deputy Eaton were standing behind Mr. Thorington; is that right?
>
> A: That's correct.
>
> Q: Was he facing them?
>
> A: No. He was facing his vehicle. They were standing behind him.
>
> Q: Okay. And what was happening.
>
> A: Deputy Eaton was applying handcuffs to his left arm and I walked up. I heard Sgt. Cuddle tell him, "Stop resisting, calm down." And they were not – they were just kind of moving here and there. So I took a set of handcuffs and handcuffed his left hand. And then I connected the right handcuff to the left handcuffs.
>
> Q: He already had a handcuff on his left arm?
>
> A: Yes. I put the left handcuff on because I did not – I guess I did not realize he already had a handcuff on his right hand.
>
> Q: So let me – let me make sure I understand the sequence there. So you arrived, Mr. Thorington is facing his vehicle and Deputy Eaton is behind him, Sgt. Cuddle is behind him. Is that right so far?
>
> A: Yes.
>
> Q: And did you see Deputy Eaton place a handcuff on Larry Thorington's left arm?
>
> A: I did not.
>
> Q: But when you – I'm sorry if I cut you off. But when you approached you observed that Mr. Thorington did have one cuff on his left arm?
>
> A: Yeah. I want to retract that because I – I saw them and I – I don't know exactly the wording, but I was – I was definitely under the impression he was under arrest. When you

> have two officers grabbing their hands and placing them behind their back, it's – that was my impression. I went and applied the left handcuff. When I – when I looked over, the right handcuff was already on. I did not – wasn't aware of it. And instead of taking that other handcuff off or removing mine, also because of his big, broad, shoulders, it is a lot more comfortable when you use two handcuffs.
>
> Q: And did you then attach the handcuffs to his arms?
>
> A: I attached – my handcuff was already on his left hand – left wrist – I'm sorry, right wrist. I apologize. Then I applied the second loop to the second loop of the one that was on his left hand.
>
> Q: Was there then some effort to consolidate those into one set of handcuffs?
>
> A: It's a lot more comfortable with two sets? I even – I mean even for handcuffing myself, you know, during training purposes I like two so . . .
>
> Q: The reason its more comfortable obviously is because there's more space allowed for your hands?
>
> A: That's correct. Probably adds another 6 to 8 inches.

Townsend Dep. at 16-17. This testimony does not eliminate the dispute of fact as to whether Townsend jerked Plaintiff's arm and injured his elbow.

Defendant does not offer any alternative explanation for Plaintiff's injuries. The only discussion regarding the cause of the injury was in his reply brief. He contends that "Dr. Walkiewicz testified that Plaintiff's injuries could not have resulted from this type of force." But that is not what Dr. Walkiewicz's testified to:

> Q: Am I accurately describing what he said, he said his arm was not behind him, it was to his side and the force was downward, correct?
>
> A: I think that's what I heard.
>
> Q: Do you think that the types of injuries we're dealing with here – I won't go through all of them, we know what they are at this point – could that happen with an arm to the side, just downward pressure –
>
> A: A direct traction injury, I think it would be unlikely to injure a collateral ligament.
>
> Q: Thank you, Doctor.

A: I would be more worried about a shoulder injury.

Walkiewicz Dep. at 142, ECF No. 23-5.

**B.**

Defendant's motion for summary judgment will be granted as to Plaintiff's deliberate indifference claim. Plaintiff cannot meet the objective component of the claim. Plaintiff does not contend that his elbow contusion was a serious injury necessitating immediate medical care. His testimony and the evidence of the swelling, bruising, and redness on his elbow while he was incarcerated does not establish a genuine issue for trial because, based on those symptoms, there was no apparent injury other than a contusion. Indeed, the ER doctor diagnosed Plaintiff with nothing more than a contusion and discharged him the same night. ECF No. 17-11.

The serious injury Plaintiff did suffer was a blowout tear of his lateral ulnar collateral ligament as well as a deep partial tear at the origin of the common extensor tendon ECF No. 17-11 at 2. However, even in cases where the underlying ailment is undeniably serious, a plaintiff fails to establish the objective component of a deliberate indifference claim where the seriousness is not readily apparent. *See Durham v. Nu 'Man,* 97 F.3d 862, 869 (6th Cir. 1996). Here, the ER doctor did not detect the blowout tear. The blowout tear was not diagnosed until five days later during a follow-up MRI. On these facts, no reasonable jury could find that the seriousness of Plaintiff's injury was readily apparent while Plaintiff was held at the Gladwin County Jail.

**IV.**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 17, is **GRANTED** in part and **DENIED** in part as set forth above.

It is further **ORDERED** that Count II of the complaint, ECF No. 1, is **DISMISSED** with prejudice and Defendant Sheriff Michael Shea is **DISMISSED** as a defendant.


                                              s/Thomas L. Ludington  
                                              THOMAS L. LUDINGTON  
                                              United States District Judge

Dated: March 29, 2019